SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

ELISABETH ("ELI") HOLMES (OSB #120254)
Willamette Riverkeeper
P.O. Box 293
Eugene, OR 97440
(541) 870-7722 | Phone
eli@willametteriverkeeper.org

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, SODA MOUNTAIN WILDERNESS COUNCIL, and WILLAMETTE RIVERKEEPER,**<br><br>*Plaintiffs,*<br><br>vs.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT,**<br><br>*Defendant.* | Civ. Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.* |

## INTRODUCTION

1.    Plaintiffs Cascadia Wildlands, Klamath-Siskiyou Wildlands Center, Oregon Wild, Soda

Mountain Wilderness Council, and Willamette Riverkeeper ("Plaintiffs") bring this action for

declaratory and injunctive relief against federal Defendant Bureau of Land Management ("the

BLM") for promulgating a categorical exclusion ("Salvage CX") that violates 5 U.S.C. § 706 of

PAGE 1 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the Administrative Procedure Act ("APA") and 42 U.S.C. § 4332 of the National Environmental Policy Act ("NEPA").[1]

2.      This action arises from the BLM's establishment of the Salvage CX, *National Environmental Policy Act Implementing Procedures for the Bureau of Land Management,* 85 Fed. Reg. 79,517 (Dec. 10, 2020) ("Salvage CX Rule"), which Plaintiffs challenge on its face.

3.      Plaintiffs also incorporate an as-applied challenge to the Salvage CX as used by the BLM to authorize the Harvest Land Base-Moderate Intensity Timber Area ("HLB-MITA") Salvage Project.

4.      Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

5.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question) because this action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* and the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.*

6.      The relief sought is authorized by 28 U.S.C. § 2201 (Declaratory Judgment) and 28 U.S.C. § 2202 (Injunctive Relief).

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because Defendant is a federal agency of the United States government and a substantial part of BLM property that is subject to the challenged Salvage CX Rule is situated within this judicial district.

---

[1] Pursuant to 16 U.S.C. § 1540(g), Plaintiffs intend to provide 60 days' notice of legal violation to the BLM for failure to consult on the Salvage CX final rule in violation of Endangered Species Act Section 7. If the BLM fails to provide a satisfactory response, Plaintiffs will take appropriate steps to amend this complaint to include these claims at the conclusion of the 60-day period.

## INTRADISTRICT ASSIGNMENT

8.     This case is properly assigned to the Eugene Division under Civil L.R. 3-2 because the

challenged site-specific implementation of the Salvage CX Rule, the HLB-MITA Salvage

Project, is located in Lane County within this Division. Other BLM-managed lands also affected

by the Salvage CX Rule, at issue in this dispute, are located within the Eugene Division. The

BLM's violations of federal law have and will continue to affect lands located within the Eugene

Division.

9.     Additionally, the office of Plaintiff Cascadia Wildlands is located within the Eugene

Division, Plaintiff Willamette Riverkeeper maintains a South Valley office within the Eugene

Division, and many individual members of each of the Plaintiff organizations are located within

the Eugene Division.

## PARTIES

10.    Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in

Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is

devoted to the conservation of the Cascadia Bioregion, which extends from northern California

to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing,

outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable,

restoration-based forestry. Cascadia Wildlands' members use and enjoy BLM land and the area

within and surrounding the HLB-MITA Salvage Project. Cascadia Wildlands provided timely

comments on the Salvage CX Rule and on the HLB-MITA Salvage Project.

11.    Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic

non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild

has over 3,500 members and supporters in more than 10 states, with most members concentrated

PAGE 3 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in monitoring, commenting on, and challenging in court actions affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by the Salvage CX on BLM lands, and specifically the HLB-MITA Salvage Project. KS Wild provided timely comments on the Salvage CX Rule and on the HLB-MITA Salvage Project.

12.     Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the HLB-MITA Salvage Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of this timber sale would irreparably harm the interests of Oregon Wild and its members. Oregon Wild provided timely comments on the Salvage CX Rule and on the HLB-MITA Salvage Project.

13.     Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("SMWC") is a non-profit organization incorporated in Oregon with an office near Ashland, Oregon. SMWC has approximately 325 members and mails to about ten times that many addresses, with most

members and addresses concentrated in southern Oregon and some in northwestern California and elsewhere in the United States. SMWC is dedicated to protecting and restoring wildlands and outstanding biodiversity in southern Oregon and northern California. SMWC monitors federal public lands, including BLM forests, to ensure that management complies with relevant federal laws, including environmental laws. SMWC educates the public and elected officials, writes comments, and otherwise advocates for protection of BLM-managed forests and proper post-fire management on public land. SMWC provided timely comments on the Salvage CX Rule and on the HLB-MITA Salvage Project.

14.     Plaintiff WILLAMETTE RIVERKEEPER is a 501(c)(3) and Oregon non-profit corporation headquartered on the Willamette River in Portland, Oregon with nearly 2,500 members. Since 1996, Willamette Riverkeeper has served as the eyes, ears, and voice of the Willamette River Basin Waters. The organization's sole mission has been to protect and restore the Willamette River's water quality, habitats for wildlife and aquatic species, and resources. Willamette Riverkeeper works throughout the basin on programs, policy objectives, and projects ranging from Clean Water Act compliance and river education, to Superfund cleanup and habitat restoration, and where necessary, litigation. Willamette Riverkeeper believes that a river with good water quality and abundant natural habitat, safe for fishing and swimming, is a basic public right. Here, where the project impacts will negatively affect basin water quality, essential water quality functions, and fish and wildlife habitat, Willamette Riverkeeper joins as a Plaintiff to protect the organization's and our members' interests in the McKenzie and Mohawk Rivers, which are important tributaries of the Willamette River, and within the HLB-MITA Salvage Project area. Willamette Riverkeeper provided timely comments on the HLB-MITA Salvage Project.

PAGE 5 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

15.     Plaintiffs will suffer harm through implementation of the Salvage CX because the

Salvage CX will lead to the loss of post-disturbance forest habitat through logging without

detailed environmental review. Plaintiffs view, experience, utilize, recreate, and otherwise enjoy

post-disturbance forestland and forest waters that the BLM proposes to log within and destroy

through implementation of projects utilizing the Salvage CX. Despite effects from wildfire and

other disturbances, Plaintiffs value these forestlands and forest waters because of their unique

habitat and ability to develop into renewed ecosystems beneficial to flora, fauna, and fish alike.

Plaintiffs will not be able to use, enjoy, or appreciate these forests and forest waters if they are

logged without detailed environmental review following disturbances.

16.     Plaintiffs are harmed by the HLB-MITA Salvage Project because the project will lead to

the logging of 910 acres of forest burned by the 2020 Holiday Farm fire near Vida, Oregon.

Logging the post-fire forest will harm Plaintiffs' interest in viewing, experiencing, utilizing,

recreating, and otherwise enjoying post-fire forests and waters that present plaintiffs with an

opportunity to experience a post-fire ecosystem. The HLB-MITA Salvage Project will destroy

this post-fire ecosystem and prevent Plaintiffs from experiencing and enjoying any subsequent

successional stages that will develop in the future. Plaintiffs regularly visit and enjoy the

forestland encompassed by the Holiday Farm Fire and the HLB-MITA Salvage Project area

specifically.

17.     Defendant BUREAU OF LAND MANAGEMENT ("the BLM") is a federal agency

within the Department of the Interior. The BLM is responsible for administering federal public

lands, including the HLB-MITA Salvage Project area, Oregon and California Revested Lands,

and other public lands in the West, in accordance with the APA, NEPA, ESA, and other federal statutes.

18.    The BLM promulgated the final Salvage CX Rule on December 10, 2020, following a public review and comment period ending on July 2, 2020. The Salvage CX Rule permits the BLM to engage in salvage logging of dead and dying trees for an area of up to 1,000 acres for disturbances of 3,000 acres or less and one third of the disturbance area, but not to exceed 3,000 acres, for disturbances greater than 3,000 acres ("3,000-acre CX"). The Salvage CX also authorizes the BLM to construct up to 1 miles of permanent road to facilitate the covered actions. 85 Fed. Reg. 79,517. The BLM states that the Salvage CX will allow the BLM to fulfill NEPA requirements to engage in salvage logging. *Id.*

19.    The BLM issued a scoping notice for the HLB-MITA Salvage Project on December 11, 2020. Plaintiffs provided timely comments.

20.    The BLM issued a proposed CX document for the HLB-MITA Salvage Project on April 27, 2021, which relied upon the Salvage CX Rule. Plaintiffs provided timely comments.

21.    The BLM issued a final CX document and Decision Record for the HLB-MITA Salvage Project on May 26, 2021.

22.    Plaintiffs timely appealed the HLB-MITA Salvage Project CX to the Interior Board of Land Appeals ("IBLA") on June 23, 2021.

23.    IBLA denied Plaintiff's Petition for Stay by order dated July 8, 2021.

24.    Plaintiffs filed a motion to withdraw their IBLA appeal on July 27, 2021. IBLA granted Plaintiffs' motion and dismissed the appeal on August 4, 2021.

## LEGAL BACKGROUND

**The Administrative Procedure Act**

25.     The APA is a federal statute that was enacted "to improve the administration of justice by prescribing fair administrative procedure." Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946); 5 U.S.C. § 551 *et seq.* (2018).

26.     An agency undertaking rulemaking shall publish a general notice of the proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). The notice must include three elements: 1) a statement of the time, place, and nature of public rule making proceedings; 2) reference to the legal authority under which the rule is proposed; and 3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. *Id*. After publishing notice, the agency shall give all interested persons an opportunity to participate in the rulemaking through submission of written comments, with or without opportunity for oral presentation. 5 U.S.C. § 553(c). The agency then incorporates in the adopted rule a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553(c). This process is generally referred to as informal rulemaking or notice-and-comment rulemaking.

27.     Under the APA, an agency is required to supply a reasoned decision when promulgating a new rule. Without a reasoned decision reflected in the administrative record, the agency action is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

28.     The APA provides for judicial review of final agency action, including notice-and-comment rulemaking. 5 U.S.C. § 706. A court may decide all relevant questions of law, interpret constitutional statutory provisions, and determine the meaning or applicability of the terms of an agency action. In doing so, the reviewing court shall hold unlawful and set aside agency action,

findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

29.     The Supreme Court has held that an agency action is arbitrary and capricious "if [an] agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs Ass'n v. State Farm,* 463 U.S. 29, 43 (1983). Further, the Court stated that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*

30.     An agency's rationale for a new policy must be clearly disclosed and adequately sustained in the administrative record. *SEC v. Chenery Corp*, 318 U.S. 80, 94 (1943).

31.     Further, an agency is free to change its existing policies as long as a reasoned explanation is provided for the change. *Encino Motorcars LLC v. Navarro,* 136 S.Ct 2117, 2125 (2016); *see also Motor Vehicles Mfrs Ass'n,* 463 U.S. at 42; *Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) ("even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation").

32.     When an agency changes position it must demonstrate that: (1) a new rule is permissible under the statute; (2) there are good reasons for the change; (3) the agency believes it to be better; and (4) the agency displays awareness that it is changing its position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-16 (2009) (*Fox*). Furthermore, when an agency reverses course and chooses a new policy direction, it must address how the new policy affects other parties who have relied upon the old policy to meet their legal obligations; and failing to

take account of legitimate reliance interests is arbitrary and capricious. *Fox*, 556 U.S. at 515-16;

*Smiley v. Citibank (South Dakota), N.A*., 517 U.S. 735, 742, (1996); *Encino Motorcars*,136 S.Ct.

at 2125-26 (2016).

33.     An unexplained inconsistency in agency policy is grounds for holding the policy change

arbitrary, capricious, and not in accordance with law. 5 U.S.C § 706(2); *Encino Motorcars,* 136

S.Ct. at 2126 (citing *National Cable and Telecommunications Ass'n v. Brand X Internet*

*Services,* 545 U.S. 967, 981 (2005)).

34.     The APA requires an agency to provide interested persons "an opportunity to participate

in the rule making through submission of written data, views, or arguments with or without

opportunity for oral presentation." 5 U.S.C. § 553(c). An agency is obligated to respond to

significant comments received during the public comment period. *Perez v. Mortgage Bankers*

*Ass'n,* 575 U.S. 92, 96 (2015). The Ninth Circuit Court of Appeals has defined "significant"

comments as "those which raise relevant points and which, if adopted, would require a change in

the agency's proposed rule." *American Mining Congress v. U.S. E.P.A.,* 965 F.2d 759, 771 (9th

Cir. 1992) (citing *Home Box Office v. FCC,* 567 F.2d 9, 35 & n. 58 (D.C. Cir. 1977)). Failure to

respond to significant comments may be grounds for reversal if the failure reveals the agency's

decision was not based on consideration of the relevant factors. *Id.* (citing *Thompson v. Clark,*

741 F.2d 401, 409 (D.C. Cir. 1984)).

**The National Environmental Policy Act**

35.     The National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. §§ 4331 *et seq.*

(2018), was enacted by Congress to ensure that effects to human health and the environment

were considered in all federal agency decisions. NEPA requires the preparation of an

environmental impact statement ("EIS") for "major federal actions significantly affecting the

quality of the human environment." 42 U.S.C. § 4332(C). NEPA established the Council of

Environmental Quality ("CEQ"), housed in the Executive Office of the President, and charged

the CEQ with formulating and recommending national policies that promote the improvement of

the quality of the environment in light of the Congressional declaration of policy set forth in the

first subchapter of NEPA. 42 U.S.C. § 4342. National policies developed by CEQ aim to foster

and promote the improvement of environmental quality to meet the conservation, social,

economic, health, and other requirements and goals of the Nation. 42 U.S.C. § 4344.

36.     The original regulations implementing NEPA were published in 1978. *See*

*Implementation of Procedural Provisions, Final Regulations,* 40 Fed. Reg. 55,978 (Nov. 29,

1978). In 2020, the Trump Administration published new CEQ NEPA regulations containing

significant substantive changes, the first significant update since the original regulations were

published. *See Update to the Regulations Implementing the Procedural Provisions of the*

*National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020) (codified at

40 C.F.R. Part 1500) ("2020 Rule").

37.     The Salvage CX rulemaking process began under the 1978 regulations but was finalized

during the transition period to the new regulations.

38.     On his first day of office, President Biden issued Executive Order 13990: *Protecting*

*Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*. EO

13990 states that the policy of the Biden Administration is to, *inter alia*, listen to the best

available science, improve public health, and protect our environment. EO 13990 directs the

heads of all agencies to review all existing regulations, orders, guidance documents, policies, and

any similar agency actions promulgated, issued, or adopted between January 20, 2017, and

January 20, 2021 that are inconsistent with the policy statement.

39.     The Biden Administration provided a non-exclusive list of agency actions that the heads

of relevant agencies will review in accordance with EO 13990. CEQ has already taken steps to

review and revise the 2020 CEQ NEPA regulations.

40.     In response to EO 13990, the Secretary of Interior issued Secretarial Order ("SO") No.

3399: *Department-Wide Approach to the Climate Crisis and Restoring Transparency and

Integrity to the Decision-Making Process*. SO 3399 states that "Bureaus/Offices will not apply

the 2020 Rule in a manner that would change the application or level of NEPA that would have

been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020."

41.     Under the 1978 regulations, CEQ directs federal agencies determining whether to prepare

an environmental impact statement to look to whether the proposal is one which normally

requires an environmental impact statement ("EIS") or normally does not require either an EIS or

an environmental assessment ("EA"). 40 C.F.R. § 1501.4 (1978). If the latter, the action falls

under a CX. A CX is "a category of actions which do not individually or cumulatively have a

significant effect on the human environment, and which have been found to have no such effect

in procedures adopted by a federal agency in implementation of these regulations (§ 1507.3) and

for which, therefore, neither an environmental assessment nor an environmental impact

statement is required." 40 C.F.R. § 1508.4 (1978).

42.     Federal agencies may adopt individual procedures to supplement the CEQ regulations,

and CXs must be identified within these adopted procedures. 40 C.F.R. § 1507.3 (1978). The

BLM's NEPA procedures are described in its NEPA handbook. BUREAU OF LAND

MANAGEMENT, NEPA HANDBOOK, H-1790-1 (2008). The BLM has identified a CX that permits

"salvaging of dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of

temporary road construction." ("CX C.8"). *Id.* at Appendix 4

43.    When preparing an EIS, federal agencies must consider both direct and indirect effects. Direct effects "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (1978). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (1978).

44.    Federal agencies must also consider cumulative impacts when preparing an EIS. A cumulative impact is the environmental impact of an action when added to past, present, and future actions, regardless of what agency or person undertakes other actions. Cumulative impacts can result from individually minor but collectively significant actions occurring over a period of time. 40 C.F.R. § 1508.7 (1978).

45.    In the alternative, under the 2020 regulations, federal agencies should consider the following when determining the appropriate level of NEPA review for an action: whether the action "(1) Normally does not have significant effects and is categorically excluded (§ 1501.4); (2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or (3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement [(§ 1502)]." 40 C.F.R. § 1501.3 (2020).

46.    Like the 1978 regulations, the 2020 regulations direct agencies to identify in their agency NEPA procedures categories of actions that normally do not have a significant effect on the human environment, and therefore do not require the preparation of an EA or EIS. 40 C.F.R. § 1501.4 (2020).

47.    Under the 2020 regulations, federal agencies must consider the "effects" of the agency's action, which are defined as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the

proposed action of alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives."  40 C.F.R. § 1508.1(g) (2020).

## FACTUAL BACKGROUND

**Best Available Science Regarding Post-Disturbance Land Management**

48.     There is overwhelming scientific consensus that post-disturbance logging is highly scientifically controversial. DAVID B. LINDENMAYER, PHILIP J. BURTON, AND JERRY F. FRANKLIN, SALVAGE LOGGING AND ITS ECOLOGICAL CONSEQUENCES (2008). General ecological concerns associated with salvage logging include impacts to soils, understory vegetation, fuel loads, and post-fire habitat features including snags and burned logs. *Id.* The economic feasibility of salvage logging may depend on removing larger dead trees which are likely to be highly valuable to post-fire dependent wildlife. USDA FOREST SERVICE PACIFIC SOUTHWEST RESEARCH STATION, SCIENCE SYNTHESIS TO PROMOTE RESILIENCE OF SOCIAL-ECOLOGICAL SYSTEMS IN THE SIERRA NEVADA AND SOUTHERN CASCADES (Jonathan W. Long & Quinn-Davidson 2013) ("SCIENCE SYNTHESIS").

49.     The best available science indicates that salvage logging is detrimental to wildlife because of the vital role down wood and snags play in meeting life history needs of wildlife species. CATHY L. ROSE ET AL., DECAYING WOOD IN PACIFIC NORTHWEST FORESTS: CONCEPTS AND TOOLS FOR HABITAT MANAGEMENT *IN* WILDLIFE-HABITAT RELATIONSHIPS IN OREGON AND WASHINGTON 584 (2001). Unsalvaged, naturally regenerated, young stands are some of the best wildlife habitats in forests and is an essential stage of natural forest processes. DAVID B. LINDENMAYER & JERRY F. FRANKLIN, CONSERVING FOREST BIODIVERSITY: A COMPREHENSIVE MULTISCALE APPROACH 69 (2002). The biodiversity of these stands' rivals that of old growth

forests, and young stands are one of the rarest forest types in the Pacific northwest. *Id.* Salvage logging removes dead wood from the landscape which is likely to have adverse effects on more than 50 species of birds and mammals that use snags for nesting, feeding, and shelter. OREGON FOREST RESOURCES INSTITUTE, FOREST PROTECTION LAWS – AN ILLUSTRATED MANUAL 38 (3rd ed. 2018). Commercial salvage logging almost always focuses on removing large trees which disproportionately harms wildlife because larger trees are likely to be disproportionately valuable for wildlife species that use postfire snags. SCIENCE SYNTHESIS 196.  Salvage logging also harms big game populations by removing hiding cover after the landscape is changed by fire and by increasing adverse impacts related to construction and use of roads. M. Hebblewhite et al., *Trophic consequences of postfire logging in a wolf-ungulate system*, 257 FOREST ECOLOGY AND MANAGEMENT 1053 (2009).

50.     The best available science indicates that salvage logging has adverse effects on water quality. James R. Karr et al., *The Effects of Postfire Salvage Logging on Aquatic Ecosystems in the American West,* 54 BIOSCIENCE 1029, 1030 (2004). By adding another stressor to already burned watersheds, post-fire salvage logging worsens already degraded aquatic conditions, impedes recovery and restoration of aquatic systems, lowers water quality, shrinks the distribution and abundance of native aquatic species, and compromises the flow of economic benefits derived from aquatic resources. *Id.* Salvage logging exacerbates fire effects and increases runoff volume, runoff velocities, and sediment concentrations. Peter Robichaud et al., *Rill Erosion in Post Wildfire Forests after Salvage Logging,* 18 GEOPHYSICAL RESEARCH ABSTRACTS EGU2016-17814 (2016).

51.     Salvage logging followed by replanting likely has significant effects on water quantity. Dense, young stands significantly deplete summer low streamflows for decades. Timothy D.

Perry & Julia A. Jones, *Summer streamflow deficits from regenerating Douglas-fir forest in the Pacific Northwest, USA,* ECOHYDROLOGY, DOI 10.1002/eco.1790 (2016). Summer low streamflows present several ecological issues for fish, other aquatic organisms, and ecosystem services. Catalina Segura et al., *Long-term effects of forest harvesting on summer low flow deficits in the Coast Range of Oregon,* 585 JOURNAL OF HYDROLOGY (2020). High stream temperatures caused by low streamflows are a critical limiting factor for fish. *Id.*  Low flows reduce pools and pool depth, limit migration, and restrict quality habitat. *Id.* Low streamflows can also cause water shortages. *Id.*

52.    Salvage logging poses adverse effects to soil which is closely connected with water quality. DAVID H. MCNABB & FREDERICK J. SWANSON, EFFECTS OF FIRE ON SOIL EROSION *IN* NATURAL AND PRESCRIBED FIRE IN PACIFIC NORTHWEST FORESTS (John D. Walstad et al. eds., 1990). Salvage logging increases soil erosion and sedimentation of streams through many mechanisms. *Id.* These include direct disturbance to soil, damage to live and dead roots, removal of organic material, delay of revegetation, construction of roads and landings, increased channel erosion from peak flow caused by loss of large logs that anchor snowpack, and mobilization of soil particles that seal the soil surface. *Id.* Further, salvage logging disturbs natural revegetation which has a direct contribution to controlling erosion and sedimentation. SUSAN H. CANNON ET AL., UNITED STATES GEOLOGICAL SURVEY, PRELIMINARY EVALUATION OF THE FIRE-RELATED DEBRIS FLOWS ON STORM KING MOUNTAIN, GLENWOOD SPRINGS, COLORADO (1995). Vegetation provides several major physical functions that help control soil erosion during rainfall. *Id.* These include interception of rainfall which extends the time for water to reach the ground and absorbs raindrop impact energy, mulching of the ground surface to provide temporary water storage and slow release, structural support of loose and superficial material, reinforcement of deeper soil by

roots increasing natural slope stability, and maintenance of conditions necessary for soil microorganisms that provide soil structure. *Id.*

53.     The best available science indicates that salvage logging increases fire severity where post-fire logging has occurred, and that salvage logging does not reduce the intensity or severity of subsequent fires. David W. Peterson et al*., Post-fire logging reduces surface woody fuels up to four decades following wildfire*, 338 FOREST ECOLOGY AND MANAGEMENT 84, (2015). Salvage logging increases small fuels that are the most hazardous and reduces large wood which is the most valuable to wildlife. *Id*. Post-fire logging transfers woody debris from tree branches and canopies to the forest floor which produces higher surface woody fuels in logged stands*. Id*. at 88. Higher surface woody fuels can increase short-term fire hazards in logged stands. *Id*. Large fuels contribute the least to fire hazards. *Id.* Intensive reforestation after logging typically substitutes conifer biomass for shrub biomass. Christopher J. Dunn & John D. Bailey, *Modeling the direct effects of salvage logging on long-term temporal fuel dynamics in dry-mixed conifer forests*, 341 FOREST ECOLOGY AND MANAGEMENT 93, (2015). Understory woody vegetation reestablishes quickly and can be a highly flammable fuel layer, as well as a source of post-fire fine woody fuels when shrub crowns die. *Id.* Post-fire landscapes are the least hazardous fuel profiles not just in the short-term, but for several decades after wildfire. C. Larry Mason et al., *Investigation of Alternative Strategies for Design Layout and Administration of Fuel Removal Projects,* RURAL TECHNOLOGY INITIATIVE (2003).

**BLM's Verification Report**

54.     To support its decision to exempt salvage logging projects from NEPA review, the BLM published a "Verification Report" on November 17, 2020. Wade Salverson and Christian Schumacher, *[Final] BLM Timber Salvage Categorical Exclusion Verification Report,* 19 (Nov.

17, 2020) ("Verification Report"). The purpose of the report is to explain the basis for establishing the Salvage CX Rule through review of environmental assessments ("EAs"), environmental impact statements ("EISs"), scientific literature, professional experience, and monitoring data. *Verification Report* at 1.

55.    The BLM did not address or disclose any of the foregoing scientific findings, controversy, or the best available science in its Verification Report that purports to support the Salvage CX.

56.    The BLM identified, reviewed, and analyzed 18 EAs to develop the Salvage CX. In its review, the BLM found that none of the 18 EAs predicted significant impacts to result from any of the actions or alternatives considered, and the BLM reached a Finding of No Significant Impact ("FONSI") for each of the 18 EAs. *Verification Report* at 17.

57.    The BLM noted that all proposed actions and alternatives analyzed were in conformance with the applicable land use plans ("LUP") and included project design features. *Id.* LUPs and accompanying project design features are developed for the specific area where the project is located based on site-specific ecological conditions. *Id.* Project design features are essentially the same as mitigation measures: constraints on agency action employed for the protection of the environment.

58.    The BLM stated that developing a list of standard project design features as required components in the Salvage CX was not possible given the variability in specifications by region and land use planning area. *Id.* at 18.

59.    The BLM's Verification Report identified two EISs that evaluated salvage logging projects: (1) the Timbered Rock Fire Salvage and Elk Creek Restoration Project; and (2) the Biscuit Fire Recovery Project. *Verification Report* at 23. The Timbered Rock project involved

6,780 acres of salvage, and the Biscuit Fire project involved 19,465 acres of salvage of which only 195 acres were located on BLM land. *Id.* at 24.

60.    The BLM contended that the Timbered Rock Fire Salvage and Elk Creek Restoration Project and the Biscuit Fire Recovery Project both had a complexity and scale that was substantially different from the kinds of activities that the Salvage CX would support and are therefore distinguishable. *Id.* at 24-25.

61.    Of the 18 EAs evaluated, the BLM was able to justify its findings of no significant impact only because the BLM employed mitigation measures to reduce the impact of the proposed action below the threshold of significance.

62.    Given that each of the 18 EAs evaluated employed project design features, and that the Salvage CX does not include a list of standard project design features due to the variability in projects by geographic region and land use planning area (*Verification Report* at 18), the BLM did not adequately consider the significance of unmitigated salvage logging on the unique characteristics of the applicable geographic areas when creating the Salvage CX.

63.    The projects the BLM considered in its Verification Report to benchmark the appropriate acreage for the Salvage CX do not support the acreage limitation of the Salvage CX.

64.    For example, the Timbered Rock project involved 6,780 acres of salvage and the Biscuit Fire project involved 195 acres of salvage on BLM land. The BLM now seeks to categorically exclude from detailed NEPA review individual projects which involves salvage logging up to 3,000 acres through the 3,000-acre CX, with no limit on the number of such projects that can be implemented, raising the prospect of significant effects from repeated use of the Salvage CX authority.

65.     The Verification Report provides no information regarding what constitutes significant effects for purposes of the preparation of an EA or EIS given the range of acres affected between these two allegedly illustrative projects.

66.     Similarly, the 18 EAs analyzed by the BLM involved salvage projects with acreage ranging from 14 acres to 8,700 acres, but provide no support for why the BLM chose the acreage limitation it did (3,000-acres), other than the ultimate acreage limitation appears to be roughly the median of the acreages considered. *Verification Report* at 10-11, Table 3.

67.     The BLM failed to demonstrate that salvage logging projects up to 3,000 acres each (and multiple salvage projects vastly exceeding 3,000 acres) do not have significant effects necessitating a detailed NEPA analysis considering the wide range of projects analyzed with either an EA or EIS covering acreages much less than 3,000 acres.

68.     CEQ has explained that "[c]are must be taken to ensure that any mitigation measures during the EA process are an integral component of the actions considered for inclusion in a proposed categorical exclusion." Memorandum from Nancy Sutley, CEQ Chair, to Heads of Federal Departments and Agencies, *Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act* (Nov. 23, 2010). Indeed, the Verification Report acknowledges that "when mitigation commitments are part of the basis for excluding a proposed category of actions, the agency should clearly present mitigation commitments as required project design features in the description of the category of actions being considered in the CX." *Verification Report* at 8.

69.     However, the BLM explicitly stated in the Verification Report that development of standard project design features for the Salvage CX was not suitable given the variability in

specifications by region and land use planning. *Id.* at 18. The final rule does not contain mitigation measures or a standard list of project design features.

70.     The BLM must comply with the applicable LUP in every land management decision it makes. 43 C.F.R. § 1610.5-3(a). LUPs vary by region, may not contain guidance regarding salvage logging, and do not consider the site-specific effects of project-level implementation decisions. Although the BLM concluded that "[d]evelopment of lists of standard project design features as required components of this CX is not suitable," it specifically relied on the "inclusion of project design features pertaining to the specific environmental considerations that the applicable LUPs require for forestry treatments." *Verification Report* at 18. The BLM did not resolve this inconsistency in the final rule.

**The BLM's Change in Policy Regarding Salvage Logging**

71.     In 2007, the BLM adopted a categorical exclusion permitting "salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction" ("CX C.8"). 516 DM 11.9(C)(8).

72.     In adopting CX C.8, the BLM relied on United States Forest Service data and determined that the Forest Service acreage limit of 250 acres was appropriate for the BLM CX. The BLM further stated that it would need to gather new data to support using a CX for treatment areas larger than 250 acres. *Notice of Final Action to Adopt Revisions to the Bureau of Land Management's Procedures for Managing the NEPA Process, Chapter 11 of the Department of the Interior's Manual Part 516,* 72 Fed. Reg. 45,504, 45,515 (Aug. 14, 2007).

73.     When it promulgated CX C.8 in 2007, the BLM understood that salvage logging on more than 250 acres is a category of actions that may have a significant effect on the human environment necessitating the preparation of an EA or EIS.

74.    By adopting the Salvage CX that permits salvage logging on an area up to 3,000 acres, the BLM has advanced the policy position that a 3,000-acre CX is a category of actions that will not individually or cumulatively have a significant effect on the human environment (40 C.F.R. § 1508.4 (1978)) or is a category of actions that normally does not have a significant effect on the human environment (40 C.F.R. § 1501.4 (2020)).

75.    This new policy position is a change in BLM policy regarding the appropriate level of environmental analysis for salvage logging on more than 250 acres. The BLM has not explained why salvage logging on more than 250 acres is now permissible, whereas in the past the BLM stated that at least an EA (or an EIS) should be used to assess the environmental consequences of such activity.

76.    The BLM does not intend to repeal or revise CX C.8. *Verification Report* at 9 n.3. This demonstrates that the BLM continues to view a 250-acre limit on salvage logging as an appropriate size for a categorical exclusion.

77.    However, with promulgation of the Salvage CX, the BLM now views as acceptable a categorical exclusion for salvage logging in an area up to 12 times the previously understood appropriate limit. The BLM espouses two inconsistent policy positions that cannot coexist. The BLM must either continue to hold that 250 acres of salvage logging is the limit for a categorical exclusion, or admit that this policy is no longer appropriate and that areas up to 3,000 acres are now appropriate for a categorical exclusion.

78.    The Forest Service, upon whose data the BLM relied on in promulgating CX C.8, has retained and continues to implement the 250-acre, as opposed to 3,000-acre, limit on salvage logging categorical exclusions.

79.    When the Forest Service considered expanding this salvage logging authority in a recent rulemaking, it concluded that the best available science, including that cited *supra*, "demonstrates that salvage can cause significant impacts." *See generally*, Forest Service, *National Environmental Policy Act (NEPA) Compliance, Final Rule*, 85 Fed. Reg. 73,620 (Nov. 19, 2020). The Forest Service declined to expand its salvage logging authority in its final rule.

80.    The BLM did not address its sister agency's conclusion regarding the propriety of salvage logging on more than 250 acres, even though this information was before the federal agencies prior to BLM's promulgation of the final salvage CX rule.

81.    The BLM has not demonstrated that salvage logging on more than 250 acres is a "routine action" that "do[es] not normally result in significant effects." *Verification Report* at 7.

82.    The BLM conducted a survey of the Timber Sale Information System ("TSIS") and found that 779 salvage timber sales have occurred since 1986. *Verification Report* at 9.

83.    Of the 779 sales found in TSIS, 10 covered an area of 1,000 acres of greater. *Verification Report* at 10. Thus, on average, the BLM has conducted approximately 0.29 salvage sales per year of 1,000 acres or greater over the past 34 years.

84.    The BLM has provided no record evidence that an action taken less than 1 time per year is a "routine action."

85.    Of the 779 salvage sales found in TSIS, the BLM identified 18 EAs and 2 EISs that it prepared to analyze salvage logging. *Verification Report* at 10-11. Thus, on average, the BLM has utilized an EA or EIS for salvage logging 0.53 times per year over the past 34 years.

86.    The BLM has provided no record evidence that an action taken less than 1 time per year is a "routine action."

87.     Of the 779 salvage sales found in TSIS, the BLM identified a total of 56 records of CXs with "salvage" in the title of the project, but states that the total number of salvage sales associated with CXs beyond these 56 records is unknown. *Id.* at 11. Based on the known 56 salvage sale CXs authorized by CX C.8, the BLM, on average, has conducted approximately 1.6 salvage sales per year on no more than 250 acres over the past 34 years.

88.     The BLM has provided no record evidence that an action taken 1.6 times per year is a "routine action."

89.     Assuming that the remaining 705 salvage sales (i.e., 779 sales minus the 18 projects analyzed with an EA or EIS minus the 56 known CX C.8 salvage sales) were also authorized by CX C.8, the BLM has conducted approximately 20.7 salvage sales per year on no more than 250 acres.

90.      The BLM has provided no record evidence that an action taken 20.7 times per year is a "routine action."

91.     Even if an action taken approximately 20 times per year can be considered a "routine action," the scope of that action has been limited to 250 acres or less.  While the environmental consequences of these 250-acre-or-less actions may "not normally result in significant effects," there is no record evidence demonstrating that conducting salvage logging on 3,000 acres will result in similar less-than-significant effects.

92.     Only once has the BLM conducted a salvage sale on more than 3,000 acres: in 2015, it implemented a salvage sale on 8,700 acres in Colorado. *Verification Report* at 11. The BLM has provided no record evidence that an action taken once in 34 years is a "routine action," or if it is, that "routinely" conducting salvage logging on 3,000 acres will result in no significant direct, indirect, and/or cumulative effects.

PAGE 24 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**HLB-MITA Salvage Project**

93.    The HLB-MITA Salvage Project will log 910 acres of forest in an area burned by 2020's Holiday Farm fire near Vida, Oregon. Pursuant to the BLM's governing LUP, burned stands will only retain 5% of the logged area in tree cover.

94.    The BLM authorized the HLB-MITA Salvage Project pursuant to the Salvage CX.

95.    Plaintiffs' scoping comments and CX comments alerted the BLM that the Salvage CX is facially invalid and that BLM should not rely on the Salvage CX to authorize the HLB-MITA Salvage Project.

96.    Plaintiffs' scoping comments and CX comments alerted the BLM that the Salvage CX is inappropriate for the HLB-MITA Salvage Project given the scope of existing extraordinary circumstances present in the project area. The presence of any one extraordinary circumstance requires the BLM to forego a CX and prepare an environmental analysis and/or EIS. 43 C.F.R § 46.205(c)(1).

97.    Plaintiffs' comments identified several extraordinary circumstances whose existence prevents the use of any CX for this project. 40 C.F.R. § 1508.4 (1978); 40 C.F.R. § 1501.4 (2020); 43 C.F.R §§ 46.205, 46.215. Applicable extraordinary circumstances include, among others, significant impacts to public health or safety; significant impacts on natural resources and unique geographic characteristics; highly controversial environmental effects or involvement of unresolved conflicts concerning alternative uses of available resources; highly uncertain and potentially significant environmental effects or involvement of unique or unknown environmental risks; precedent for future action or representation of a decision in principle about future actions with potentially significant environmental effects; direct relationship to other actions with individually insignificant but cumulatively significant environmental effects;

significant impacts on species listed or proposed to be listed, on the list of endangered or threatened species or significant impacts on designated critical habitat for these species; violation of a federal law, or a state, local, or tribal law or requirement imposed for the protection of the environment; and contribution to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or possible promotion of the introduction, growth, or expansion of the range of such species.

98.     Plaintiffs' scoping comments and draft CX comments alerted the BLM that existing NEPA significance factors require the BLM to prepare an EIS for this project. Plaintiffs' comments identified cumulative impacts that require preparation of a NEPA analysis prior to implementing this project. Plaintiffs' comments identified scientific controversy regarding the impacts of salvage logging practices on water quality, soil, ESA-listed species, and forest health.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)):**
**Failure to Demonstrate a Reasoned Decision in Rulemaking**

99.     Plaintiffs incorporate by reference all preceding paragraphs.

100.    The BLM's issuance of the Salvage CX is a "final agency action" subject to judicial review under the APA. 5 U.S.C. § 704.

101.    Under the APA, an agency is required to supply a reasoned decision when promulgating a new rule. Without a reasoned decision reflected in the administrative record, the agency action is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

102.    The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

103.    An agency action is arbitrary, capricious, and not in accordance with law "if [an] agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs Ass'n*, 463 U.S. at 43. The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*

104.    The BLM failed to supply a reasoned decision that supports the promulgation of the Salvage CX. The BLM failed to make a rational connection between the facts in the record, including comments submitted by Plaintiffs, and the conclusions it made in the Salvage CX, and/or failed to consider an important aspect of the problem, and/or relied on factors that it should not have considered.

105.    The BLM failed to consider the potential significant effects of the rulemaking, did not consider the scientific controversy surrounding the effects of post-disturbance logging, and failed to consider the best available science concerning the effects of post-disturbance logging on wildlife, water quality, soils, and fire risk among other issues.

106.    Because the BLM failed to reach a rational decision because it disregarded the potential significance of the Salvage CX and the effects it may have on the natural environment, the Salvage CX is arbitrary and capricious in violation of the APA.

107.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)):
### Failure to Explain Change in Agency Policy Position

108.    Plaintiffs incorporate by reference all preceding paragraphs.

109.    "[A]n agency changing course" is "obligated to supply a reasoned analysis for the change" beyond what would be required if the agency were operating on a clean slate. *Motor Vehicles Mfrs Ass'n*, 463 U.S. at 42.

110.    When an agency issues a regulation changing or amending a prior regulation, it must demonstrate that: (1) a new rule is permissible under the statute; (2) there are good reasons for the change; (3) the agency believes it to be better; and (4) the agency displays awareness that it is changing its position. *Fox,* 556 U.S. at 514-16.

111.    The failure to provide a reasoned explanation for changing a course of policy is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

112.    The BLM failed to demonstrate awareness that it changed policy positions on the scope and scale of salvage logging authorized by the Salvage CX final rule, nor did it provide sufficient rationale for the Salvage CX. The BLM did not provide a reasoned explanation for finding that salvage logging on up to 3,000 acres will not pose significant environmental impacts in any situation, whereas previously BLM policy dictated that salvage logging on more than 250 acres may pose a significant environmental impact that should be considered in an EA or EIS.

113.    Because the BLM failed to provide a reasoned explanation for its change in policy position, the Salvage CX is arbitrary and capricious in violation APA and is facially invalid.

114.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF

### Violation of National Environmental Policy Act (42 U.S.C. § 4332(C)):
### Failure to Prepare an Environmental Assessment or Environmental Impact Statement

115.    Plaintiffs incorporate by reference all preceding paragraphs.

116.    NEPA requires all agencies of the federal government to prepare an EIS analyzing the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

117.    Under the CEQ regulations in effect while the BLM considered, proposed, and promulgated the Final Rule, a "major federal action" upon which an EIS may be required included "new or revised agency rules [and] regulations." 40 C.F.R. § 1508.18(a) (1978). The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects. 40 C.F.R. § 1508.8 (1978). An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (1978); *see also* 40 C.F.R. § 1508.27(b)(7) (1978).

118.    If the agency is unsure whether to prepare an EIS, it may prepare a less-detailed EA to determine whether and action may have significant environmental consequences. 40 C.F.R. § 1501.4 (1978).

119.    The BLM is a federal agency subject to NEPA.

120.    Promulgation of the Salvage CX is a "major federal action which may significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C).

121.    The BLM failed to prepare an EA or EIS to evaluate the potential environmental consequences of the Salvage CX. Additionally, the BLM failed to comply with NEPA by promulgating the Salvage CX under an approved categorical exclusion authorizing the promulgation of such exclusions.

122.    Because the Salvage CX is a major federal action significantly affecting the quality of the human environment within the meaning of 42 U.S.C. § 4332(2)(C), the BLM violated NEPA by failing to prepare and circulate either an EA or an EIS for public comment prior to the publication of the Salvage CX, and the Salvage CX is facially invalid.

123.    The BLM's promulgation of the Salvage CX without preparing an EA or EIS that: (a) examines a reasonable range of alternatives; (b) has a statement of purpose and need that corresponds to the agency's proposed action; (c) identifies the correct no action alternative baseline for comparing and assessing direct, indirect, and cumulative environmental effects; (d) uses high quality scientific information; and (e) examines the overarching direct, indirect, and cumulative environmental effects of the Salvage CX is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2).

124.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

### FOURTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act (5 U.S.C. §§ 551 et seq.)
and National Environmental Policy Act (42 U.S.C. §§ 4331 et seq.):
Application of the Salvage CX to the HLB-MITA Salvage Project**

125.    Plaintiffs incorporate by reference all preceding paragraphs.

126.    NEPA requires all agencies of the federal government to prepare an EIS analyzing the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

127.    If the agency is unsure whether to prepare an EIS, it may prepare a less-detailed EA to determine whether and action may have significant environmental consequences. 40 C.F.R. § 1501.4 (1978).

128.    The BLM is a federal agency subject to NEPA.

129.    In 2020, the BLM finalized the Salvage CX that allows for post-disturbance logging on 3,000 acres.

130.    The Salvage CX was promulgated without procedures required by law, i.e., ESA consultation and NEPA environmental analysis.

131.    The BLM approved the HLB-MITA Salvage Project using the new Salvage CX authority.

132.    The HLB-MITA Salvage Project is a "major federal action which may significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C).

133.    The BLM failed to prepare an EA or EIS to evaluate the potential impacts of the HLB-MITA Salvage Project.

134.    Because the Salvage CX is *ultra vires* because the BLM promulgated the final rule in violation of statutory authority, the BLM has failed to comply with NEPA by authorizing the HLB-MITA Salvage Project under an unlawfully promulgated categorical exclusion.

135.    Existing extraordinary circumstances preclude the use of a categorical exclusion for the HLB-MITA Salvage Project. 43 C.F.R §§ 46.205(c)(1), 46.215.

136.    The BLM's use of the Salvage CX to authorize the HLB-MITA Salvage Project is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

137.    The BLM's new Salvage CX as applied to the HLB-MITA Salvage Project is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

138.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

**PRAYER FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that the Court:

1.    Declare that the BLM acted arbitrarily, capriciously, and contrary to NEPA by failing to prepare an EA or EIS when it promulgated the Salvage CX final rule, and by failing to evaluate alternatives to, and the full direct, indirect, and cumulative impacts of, the Salvage CX final rule;

2.    Hold unlawful and vacate the Salvage CX;

3.    Enjoin federal defendants from implementing, enforcing, or relying upon the Salvage CX when conducting salvage logging sales;

4.    Enjoin the BLM from conducting the HLB-MITA Salvage Project using the Salvage CX;

5.    Grant Plaintiffs such further and additional relief as the Court may deem just and proper; and

6.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorney's fees associated with this litigation.

///    ///    ///

///    ///    ///

///    ///    ///

DATED this 7th day of September, 2021. Respectfully submitted,

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

ELISABETH ("ELI") HOLMES (OSB #120254)
Willamette Riverkeeper
P.O. Box 293
Eugene, OR 97440
(541) 870-7722 | Phone
eli@willametteriverkeeper.org

*Attorney for Plaintiffs*